FILED

2006 Feb-07  PM 03:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **JOHN ROBERT CULPEPPER,** et al. ] | |
| ] | |
| **Plaintiffs,** ] | |
| ] | |
| v. ] | **CASE NO.: 2:96-CV-917-VEH** |
| ] | |
| **INLAND MORTGAGE CORPORATION,** ] | |
| ] | |
| **Defendant.** ] | |
| **BEATRICE HIERS, et al.** ] | |
| ] | |
| **Plaintiffs,** ] | |
| ] | **CASE NO.: 2:98-CV-2187-VEH** |
| v. ] | |
| ] | |
| **IRWIN MORTGAGE CORP.,** f/k/a **INLAND MORTGAGE CORP.,** ] | |
| ] | |
| **Defendant.** ] | |

## MEMORANDUM OPINION ON
## PLAINTIFFS' RENEWED MOTION FOR SUMMARY JUDGMENT
## AND ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Presently pending before this Court is the Defendant's Motion for Summary

Judgment (doc. 184) and the Plaintiffs' Renewed Motion for Summary Judgment

(doc. 188).  For the reasons stated, the Defendant's Motion is **GRANTED** and

Plaintiffs' Motion is **DENIED**.

## NATURE OF THE ACTION

This action is brought under Section 8 of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, 2607.  The Plaintiffs, who received FHA mortgage loans from Defendant Irwin Mortgage Corporation, allege that Defendant's payments of yield spread premiums ("YSPs") to mortgage brokers are illegal kickbacks or referral fees prohibited under Section 8.  Defendant claims that its YSPs are not illegal kickbacks or referral fees, but legitimate compensation for goods, facilities, and services provided by mortgage brokers.  "A YSP is a payment made by a lender to a broker in exchange for that broker's delivering a mortgage that is above the 'par rate''being offered by the lender. Briefly stated, the payment is typically a certain percentage of the total amount of the loan; the exact percentage is determined by the extent to which the actual interest rate exceeds the par rate. These YSP's potentially violate Section 8(a) of RESPA, which prohibits the payment of kickback fees and referrals in association with mortgage lending." *Heimmermann v. First Union Mortg. Corp.*, 305 F.3d 1257, 1259 (11th Cir. 2002).

## PROCEDURAL HISTORY

John and Patricia Culpepper ("Culpepper", "Plaintiffs"), on April 11, 1996, filed this action for themselves and on behalf of other alleged to be similarly situated. On January 31, 1997, the court (Hancock, J.) granted Defendant's motion for

summary judgment. *Culpepper v. Inland Mortgage Corp.*, 953 F.Supp. 367 (N.D. Ala. 1997). On January 9, 1998, the Eleventh Circuit reversed and remanded for consideration of the Plaintiffs' class certification motion. *Culpepper v. Inland Mortgage Corp.*, 132 F.3d 692 (11th Cir. 1998) (*Culpepper I*). On June 22, 1998, the Eleventh Circuit denied Defendant's petition for rehearing and rehearing *en banc*. *Culpepper v. Inland Mortgage Corp.*, 144 F.3d 717 (11th Cir. 1998) (*Culpepper II*).

On July 15, 1998, the case was reassigned to Judge Pointer. On August 28, 1998, Beatrice Hiers ("Hiers", "Plaintiffs") filed a RESPA claim against Defendant Inland Mortgage Corporation (which had changed its name to Irwin Mortgage Corp.). On October 17, 1998, the case was reassigned to Judge Buttram and, on December 17, 1998, the *Culpepper* and *Hiers* cases were consolidated. On June 22, 1999, Judge Buttram granted Plaintiffs' motion for class certification. On September 29, 1999, the Eleventh Circuit granted Defendant's petition pursuant to Fed. R. Civ. P. 23(f) to review the class certification decision.

On June 15, 2001, the Eleventh Circuit issued a decision affirming the class certification decision. *Culpepper v. Inland Mortgage Corp.*, 253 F.3d 1324 (11th Cir. 2001) (*Culpepper III*). On July 23, 2001, Plaintiffs filed a motion for partial summary judgment. On August 15, 2001, the Eleventh Circuit denied Defendant's motion for rehearing and rehearing *en banc*. The mandate was issued on August 20,

2001, affirming the certification of this class.

On October 18, 2001, the Department of Urban Housing and Development ("HUD") issued a policy statement entitled "Clarification of Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b)" ("the 2001 SOP").   66 Fed. Reg. 53052.   On October 31, 2001, the Court ordered the parties to submit briefs regarding the import of the 2001 SOP.  On November 1, 2001, the parties submitted briefs as ordered, and the consolidated cases were reassigned to Judge Bowdre.

On January 22, 2002, the Supreme Court denied Defendant's motion to grant its petition for *writ of certiorari*, to vacate *Culpepper III*, and remand the case to the Eleventh Circuit to reconsider in light of the policy statement.  *Irwin Mortg. Corp. v. Culpepper*, 122 S. Ct. 930 (2002).

On March 8, 2002, the court stayed the case pending the Eleventh Circuit's resolution of three other RESPA appeals that had been argued simultaneously with *Culpepper III*.  On September 18, 2002, the Eleventh Circuit issued its decision in *Heimmermann v. First Union Mortgage Corp.*, 305 F.3d 1257 (11th Cir. 2002), *cert. denied*, 123 S. Ct. 2641 (2003).  On January 24, 2003, the Eleventh Circuit issued *per curiam* decisions in the other two RESPA appeals - *McBride v. ReliaStar*, No. 99-12110, and *Richardson v. BankAmerica Corp.*, No. 99-11554.

On February 3, 2003, Judge Bowdre denied Plaintiffs' motion for summary judgment with leave to refile after the stay was lifted.  On February 10, 2003, Judge Bowdre lifted the stay.  On March 14, 2003, the Plaintiffs filed their renewed motion for summary judgment, and Defendant filed its renewed motion to decertify the class.  The Plaintiffs also moved, on April 24, 2003,  to certify a subclass.

On September 23, 2003, the Plaintiffs moved to mediate this case.  This case was reassigned to Judge Proctor.  This case was mediated before Magistrate Judge Davis on June 14, 2004.  The mediation was unsuccessful.

On June 28, 2004, this case was reassigned to me.

On March 17, 2005, I entered a scheduling order for new motions and briefs in light of the changes in law since 2003, when the pending motions were filed.  On April 15, 2005, Defendant filed a renewed motion for summary judgment and Plaintiffs filed a renewed motion for summary judgment.  On April 18, 2005, the Defendant filed a renewed motion to decertify class.

By separate Memorandum Opinion and Order entered today, I decertified the class.

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

5

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(c) requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and al justifiable inferences are resolved in favor of the nonmovant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict or the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be

6

granted.  *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See *Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)).  If the moving party bears the burden of proof at trial, then it can meet its burden on summary judgment only by presenting positive evidence that demonstrates the absence of a genuine issue of material fact; i.e., facts that would entitle it to a directed verdict if not controverted at trial.  *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for a directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u>

7

show the absence of any evidence in the record in support of a judgment for the nonmoving party on the issue in question.  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the nonmoving party's case.  *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the nonmoving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## **RELEVANT UNDISPUTED FACTS**[1]

1.    <u>The Culpepper Loan.</u>

John and Patricia Culpepper ("the Culpeppers") obtained a federally insured

home mortgage loan from Inland Mortgage Corp. ("Inland"). The Culpeppers did not

deal directly with Inland, but dealt with Premiere Mortgage Company ("Premiere"),

a mortgage broker.

Inland, like other lenders, sends Premiere daily rate sheets that show the types

of loans Inland will make to qualified borrowers. Each type of loan has a benchmark

interest rate called the "par rate." This is the lowest interest rate at which Inland will

make loans without charging the borrower "discount points." If Premiere as the

mortgage broker brings Inland a loan at a "below par rate," then Inland requires

Premiere, who then requires the borrower, to pay discount points for the loan.

However, if Premiere brings Inland a loan with interest at an "above par rate," then

Inland pays a "yield spread premium" to Premiere.

---

[1]    Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law.  *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955); *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996).  The court will consider each motion independently, and in accordance with the Rule 56 standard.  *See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit."  *See* Wright, Miller & Kane, Federal Practice and Procedure § 2720, at 327-28 (3d ed. 1998).

On December 7, 1995, Premiere received a rate sheet from Inland and informed the Culpeppers that a 30-year loan was available at a 7.5% interest rate. The Culpeppers accepted the rate, and Premiere registered the loan with Inland.  The rate sheet showed that 7.5% was higher than Inland's par rate on 30-year loans and carried a yield spread premium of 1.675% of the loan amount, or $1,263.61. Premiere quoted the 7.5% rate notwithstanding the fact that Inland's rate sheet showed that a 30-year loan was available at 7.25%. At that lower interest rate, the yield spread premium paid to Premiere would be only 0.125% of the loan amount, or $97.20.

When the transaction closed on December 15, 1995, the Culpeppers paid Premiere an origination fee of $760.50 for Premiere's assistance in obtaining and closing their loan. Then, Inland paid Premiere the yield spread premium of $1,263.21. Thus, Premiere's total compensation for the Culpeppers' loan was $2,024.11.

Premiere has testified that this amount was fair and reasonable, considering the effort and time expended, the quality of the services provided, and the prevailing economic and competitive conditions.

The Culpeppers do not challenge the origination fee they paid to Premiere. Rather, their claim focuses solely on the legitimacy of Inland's yield spread premium payment under RESPA.

10

2.    The Hiers Loan.

Beatrice Hiers ("Hiers") obtained a federally insured home mortgage loan from Irwin Mortgage Corp. ("Irwin"). (Irwin was formerly known as Inland.  For ease of reference, the mortgage corporation will be referred to as Inland.) Hiers did not deal directly with Inland, but dealt with Homebuyers Mortgage Incorporated ("Homebuyers"), a mortgage broker.  Hiers had recently come out of bankruptcy at the time she applied to Homebuyers for the loan.

Inland dealt with Homebuyers as to Hiers on the same basis that it dealt with Premiere as to the Culpeppers, including, specifically, the payment of a YSP on above-par loans.

Homebuyers received a rate sheet from Inland and informed Hiers that an adjustable rate loan was available at a 7% interest rate. Hiers accepted the rate, and Homebuyers registered the loan with Inland.  The loan carried a yield spread premium of 2.875% of the loan amount, or $4,538.87. Homebuyers quoted the 7% rate notwithstanding the fact that Inland's rate sheet showed that adjustable rate loans were available at 5.5%. At that lower interest rate, no yield spread premium would be paid to Homebuyers.

When the transaction closed, Hiers paid Homebuyers an origination fee of $744.00 for Homebuyers' assistance in obtaining and closing the loan. She also paid

11

a commitment fee of $225.00 and a loan discount of $14.64[2].  Then, Inland paid
Homebuyers the yield spread premium of $4,538.87. Hiers does not challenge the fees
she paid to Homebuyers. Rather, her claim focuses solely on the legitimacy of
Inland's yield spread premium payment under RESPA.

Homebuyers' total compensation for the Hiers loan thus was $5,282.87.
Homebuyers has testified that its compensation was reasonable in light of the work
it performed in connection with this loan.

### 3.     Calculating The Yield Spread Premium

For both these loans, Inland's formula for determining the size of the yield
spread premium was not tied to services, but to the size and interest rate of each loan.
Inland's rate sheet shows that the amount of the yield spread premium was solely a
function of the extent to which the interest rate on each loan exceeded Inland's par
rate.  Indeed, the services provided by the mortgage brokers were the same
irrespective of the interest rate.

### 4.     Table Funded Transactions

Although the mortgage brokers were the nominal creditors on the loan
documents, neither mortgage broker funded either loan. Instead, Inland advanced the

---

[2]  Hiers paid the loan discount even though her loan was above par.

12

funds and the mortgage brokers contemporaneously assigned the loans to Inland. This type of brokerage arrangement is known as "table funding;" thus Inland, not the mortgage brokers, owned the mortgages from the outset.

## QUESTION PRESENTED -
## DID THE PAYMENTS TO THE BROKERS VIOLATE RESPA?

The Culpeppers and Hiers each allege that the payment of the YSPs by Inland to their respective mortgage brokers violated RESPA.  I begin with a brief overview of RESPA and the payment of YSPs.  Then I apply that overview to the two claims (Culpeppers and Hiers).  Finally, I discuss whether the "law of the case" doctrine mandates a different result.

I.    RESPA

Congress enacted the Real Estate Settlement Procedures Act in 1974 to protect home buyers "from unnecessarily high settlement charges caused by certain abusive practices."  12 U.S.C. § 2601(a).  To reach this end, RESPA provides the following:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a).  Notwithstanding this provision, RESPA does not prohibit "the

payment to any person of a bona fide salary or compensation or other payment for goods and facilities actually furnished or for services actually performed." 12 U.S.C. § 2607(c).

Beginning in the 1990s, numerous lawsuits began to emerge across the country alleging that the payment of YSPs from mortgage lenders to mortgage brokers violated RESPA's anti-kickback provision. *See Bjustrom v. Trust One Mortgage Corp.*, 322 F.3d 1201, 1206 (9th Cir. 2003). As a result of the uncertainty over the legality of YSPs, Congress directed HUD "to clarify its position on lender payments to mortgage brokers" in light of the fact that Congress never intended for RESPA to prohibit lender payments to mortgage brokers in exchange for services actually performed. *See* Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, 64 Fed. Reg. 10,080, 10,080 (Mar. 1, 1999) (hereinafter "1999 SOP").

In response to this congressional mandate, HUD issued the 1999 SOP, which explained that mortgage brokers receive compensation for their services through both direct and indirect fees:

> When a broker receives direct compensation from a borrower, the broker's fee is likely charged to the borrower at or before closing, as a percentage of the loan amount (e.g., 1% of the loan amount) and through direct fees (such as an application fee, document preparation fee,

processing fee, etc.).  Brokers also may receive indirect compensation from lenders or wholesalers.  Such indirect fees may be referred to as "back funded payments," "servicing release premiums" or "yield spread premiums."  These indirect fees paid to mortgage brokers may be based upon the interest rate of each loan entered into by the broker with the borrower. . . . In any of the compensation methods described, all costs are ultimately paid by the consumer, whether through direct fees or through the interest rate.

*Id.* at 10,081.  At the end of its analysis, HUD concluded that YSPs were neither *per se* legal or illegal under RESPA.  *Id.* at 10,084.  Instead of looking at YSPs as an isolated fee, HUD emphasized that the "totality of the compensation paid to the mortgage broker for the loan must be examined."  *Id.* at 10,086.  Accordingly, HUD adopted the following two-prong test to determine whether a payment from a lender to a broker is permissible under section 2607(a): (1) "whether goods or facilities were actually furnished or services were actually performed for the compensation paid"; and (2) whether the payments are reasonably related to the value of these goods or services.  *Id.* at 10,084.

Since HUD issued the 1999 SOP, the vast majority of courts adopted HUD's legal framework and held that YSPs did not violate RESPA if they satisfied the two-prong test.  *See*, *e.g.*, *Schmitz v. Ageis Mortgage Corp.*, 48 F.Supp. 2d 877, 881 (D. Minn 1999).  Nevertheless, in *Culpepper III,* the Eleventh Circuit deviated from this trend when it "concluded that class certification in a case alleging a violation of

RESPA was appropriate where the payment of a YSP was based solely upon the amount by which the loan rate exceeded the par rate and where the payment of the YSP was not tied to specific services provided by the broker." *Heimmermann*, 305 F.3d at 1259. As a response to the *Culpepper* decision, and the Eleventh Circuit's statement that the 1999 SOP was "ambiguous," HUD issued the 2001 SOP in order to further clarify its position on YSPs.

In the 2001 SOP, HUD rejected the holding of *Culpepper* and explained that neither RESPA nor the 1999 SOP supported the conclusion that a YSP can be presumed to be an illegal referral fee based upon the fact that the lender pays the broker a YSP from a rate sheet, or because the lender does not have actual knowledge of what services the broker performed. *See* 2001 SOP, 66 Fed. Reg. at 53,055. As a result of HUD's clarification, the Eleventh Circuit reconsidered its position on YSPs in *Heimmermann v. First Union Mortgage Corp.*, 305 F.3d 1257 (11th Cir. 2002), and concluded "that the substance of the 2001 SOP compels a different result in this case than the result in *Culpepper III*." *Id.* at 1263. Furthermore, the Eleventh Circuit explicitly adopted HUD's two-prong test, as explained in the 2001 SOP, as the legal analysis for deciding whether payments from a lender to a broker violate RESPA's

anti-kickback prohibition.[3]  *See id.* at 1263-64.  Given this current state of the law, the court will now turn its attention separately to whether Premiere's and Homebuyer's services and total compensation comply with HUD's two-step inquiry.

"Under the first part of HUD's test, the total compensation to a mortgage broker, of which a yield spread premium may be a component of or the entire amount, must be for goods or facilities provided or services performed."  2001 SOP, 66 Fed. Reg. at 53,055.  In other words, the court must first determine whether the mortgage broker has provided legitimate goods or services typically associated with a mortgage transaction.  *Hirsh v. BankAmerica Corp.*, 328 F.3d 1306, at 1308.  (11th Cir. April 23, 2003) (*per curiam*).  To assist in this analysis, HUD provides the following non-exclusive list of acceptable broker services:

> (a) Taking information from the borrower and filling out the application;
>
> (b) Analyzing the prospective borrower's income and debt and pre-qualifying the prospective borrower to determine the maximum mortgage that the prospective borrower can afford;
>
> (c) Educating the prospective borrower in the home buying and financing process, advising the borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments

---

[3]Because, as will be discussed below, the court rests its decision to grant summary judgment in favor of Washtenaw on the HUD test, the court need not address Washtenaw's alternative argument that the Plaintiffs have not presented any evidence to establish that the availability of a YSP "affirmatively influenced" Vickery's decision to suggest Washtenaw as the Plaintiffs' lender. *See* 12 U.S.C. § 2607(a) (prohibiting unlawful referral fees); 24 C.F.R. § 3500.14(f)(1) (2002) (defining "referral" as any payment that "has an effect of affirmatively influencing the selection by any person of a provider of a settlement service.)

could vary under each product;

(d) Collecting financial information (tax returns, bank statements) and other related documents that are part of the application process;

(e) Initiating/ordering VOEs (verifications of employment) and VODs (verifications of deposit);

(f) Initiating/ordering requests for mortgage and other loan verifications;

(g) Initiating/ordering appraisals;

(h) Initiating/ordering inspections or engineering reports;

(i) Providing disclosures (truth in lending, good faith estimate, others) to the borrower;

(j) Assisting the borrower in understanding and clearing credit problems;

(k) Maintaining regular contact with the borrower, realtors, lender, between application and closing to appraise them of the status of the application and gather any additional information as needed;

(l) Ordering legal documents;

(m) Determining whether the property was located in a flood zone or ordering such service; and

(n) Participating in the loan closing.

1999 SOP, 64 Fed. Reg. at 10,085.[4]

In this case, the plaintiffs have admitted that their mortgages provided the services that were necessary to close the loans, thus meeting the first step of HUD's test.  See Pls' Summ J br. at p. 21 (doc. 148).  See also, Pls' Reply br. at P. 16, n. 7 (doc. 161).  Therefore, I will proceed to the next step of the HUD inquiry.

---

[4]According to the 2001 SOP, the types of goods and services that satisfy the first element of the HUD test are discussed in the 1999 SOP.  *Id.*  ("In analyzing each transaction to determine if services are performed HUD believes the [1999 SOP] should be used as a guide."); *see Hirsch,* 328 F.3d, at 1309  (noting that the 1999 SOP lists the services that satisfy the first step of the HUD test).

Under the second prong of the HUD test, the court must determine "whether the total compensation paid to the broker is reasonably related to the total value of the goods or services actually provided." *Heimmermann*, 305 F.3d at 1264 & n.8 ("HUD instructs us to look at all the services performed and to evaluate them in light of all the compensation . . . the mortgage broker received from any source."). HUD defines "total compensation" to include direct fees paid by the borrower, indirect fees that are derived from the interest rates paid by the borrower, or a combination of the two. *See* 2001 SOP, 66 Fed. Red. at 53,054. Each broker's compensation was based on a combination of both indirect and direct fees. As explained above, Premiere's total compensation was $2,024.11 (the Culpepper loan); Homebuyers' was $5,282.87 (the Hiers loan).

In analyzing whether a specific level of compensation bears a reasonable relationship to the value of the goods and services provided for a specific loan, HUD has explained that courts should examine both objective and subjective factors. With regard to the objective component of this inquiry, "HUD believes that payments must be commensurate with the amount normally charged for similar services, goods or facilities. This analysis requires careful consideration of fees paid in relation to price structures and practices in similar transactions and in similar markets." 2001 SOP, 66 Fed. Reg. at 53,055. As to the subjective factors, HUD has recognized that:

the level of services mortgage brokers provide in particular transactions depends on the level of difficulty involved in qualifying applicants for particular loan programs.  For example, applicants have differences in credit ratings, employment status, levels of debt, or experience that will translate into various degrees of effort required for processing a loan.  Also, the mortgage broker may be required to perform various levels of services under different servicing or processing arrangements with wholesale lenders.

*Id.*  Therefore, HUD considers "these factors as relevant in assessing the reasonableness of mortgage broker compensation, as well as comparing total compensation for loans of similar size and similar characteristics within similar geographic markets."  *Id.*

The burden is on each of the Plaintiffs to present evidence that their respective broker's total compensation was unreasonable.  *See Hirsh*, 328 F.3d 1306.  *See also Dominguez v. Alliance Mortgage Co.*, 226 F. Supp. 2d 907, 914 (N.D. Ill. 2002); *see also Yagsur v. Aegis Mortgage Corp.*, No. 98-CV-121JMR/FLN, 2000 WL 33911217, at *2 (D. Minn. Feb 17, 2000) (granting summary judgment in favor of the defendant where the plaintiff failed to "show that the total compensation was unreasonable in relation to the goods, facilities, and services actually provided").

II.    Evidence Regarding Total Compensation - Culpepper and Hiers

To show that their respective mortgage broker's compensation was unreasonable, Plaintiffs rely on the undisputed evidence that the YSP payments did

20

not reduce either the Culpeppers' or Ms. Hiers' out-of-pocket, or "up-front," costs. Pls' Reply br., at p. 16. (doc. 161). They argue that the SOP requires that YSPs benefit the borrower in order to be reasonable. They accurately quote the SOP language; however, I do not interpret that language as they do. The SOP says: "yield spread premiums [that only] serve to increase the borrower's interest rate and the broker's overall compensation, without lowering up front cash requirements for the borrower ... *may* result in total compensation in excess of what is reasonably related to the total value of the origination services provided by the broker, and fail to comply with the second part of HUD's two-part test...." 66 Fed. Reg. at 53054 (emphasis added). Taken in context, this is not, as Plaintiffs argue, a requirement that YSPs "benefit borrowers" or else they are illegal. As usual, "may" means that something could possibly be true[5]; in this case, it means that total compensation might be excessive. "May" does not, however, dictate that outcome. That is, the Plaintiffs' evidence that their up front costs were not reduced is not sufficient, in and of itself, to establish that their mortage brokers' total compensation was excessive in light of the circumstances of each of their respective loans. Thus, each of the Plaintiffs have failed to create a triable issue of fact as to the reasonableness of their respective mortgage broker's total compensation.

---

[5] BLACK'S LAW DICTIONARY, 1000 (8th ed. 2004).

More specifically, the Culpeppers have offered nothing to suggest that Premiere's total compensation for a 30 year loan was unreasonable in comparison to the fees associated with similar loans in the relevant mortgage market in 1995, and Ms. Hiers has offered nothing[6] to suggest that Homebuyers' total compensation of $5,282.87 for an adjustable rate loan was unreasonable in comparison to the fees associated with similar loans[7] in the relevant market at that time. *See*, *Lee v. N.F. Investments, Inc.*, No. 99-CV-426, 2000 WL 33949850, at *5 (E.D. Mo. March 15, 2000) (granting summary judgment in favor of defendant on RESPA claim where the plaintiff's expert did not "compare the particular circumstances of the Plaintiffs' loan transaction to similar transactions in which the total compensation received by [the broker] was less than that received in connection with the Plaintiffs' loans").

In conclusion, the Plaintiffs have not provided me with any evidence that establishes the unreasonableness of Premiere's or Homebuyers' total compensation in light of market norms. The Plaintiffs have the burden at the summary judgment stage of producing some evidence that creates a material fact question on this issue. Because they have not provided me with this evidence, the Defendant's Motion for

---

[6]  That is, nothing admissible in this case. (Plaintiffs have offered evidence that Ms. Hiers testified before Congress and that mortgage loan industry witnesses agreed that her loan fees were "egregious.")

[7]  Including similarity in borrowers' credit histories to Ms. Hiers'.

Summary Judgment is due to be **GRANTED** and the Plaintiff's Motion for Summary Judgment is due to be **DENIED**.

## <u>LAW OF THE CASE</u>

The Plaintiffs argue that, under the "law of the case" doctrine, I must enter summary judgment in their favor and deny summary judgment to the Defendant. The Plaintiffs correctly frame "[t]he pertinent inquiry ... [as] whether the same questions of fact and law already have been determined by the court in this case ...." Pls' Reply br. at pp. 19-20 (doc. 161). While the Eleventh Circuit has written three opinions about the Culpeppers' case, the decisions in *Culpepper I* and *Culpepper II* dealt only with the facts of the Culpeppers' case.[8] Thus, neither *Culpepper I* nor *Culpepper II* could arguably be law of the case as to the Hiers case unless Hiers was part of the Culpepper class and the class certification was maintained[9].

The Eleventh Circuit's decision, in *Culpepper I*, that Inland was not entitled to

---

[8] "The only issue decided by the court [in *Culpepper I*] was whether as a matter of law Inland had proven in the instant record that this yield spread premium for this table-funded loan was a payment for goods or services and therefore not a prohibited referral fee. [The court held, in *Culpepper I*, that Inland had not proven that the particular YSP for the Culpeppers' loan was not a prohibited referral fee, and therefore Inland was not entitled to summary judgment.] As emphasized in footnote 5 of the opinion, our decision was highly dependent upon the facts in the current record about this table-funded financial transaction." *Culpepper II*, at 718.

[9] The class was not certified until after *Culpepper II*. *Culpepper III* affirmed that class certification. For the reasons stated in a separate Memorandum Opinion and Order entered today, I have decertified the class.

summary judgment based on the current record before it does not preclude me from analyzing the Plaintiffs' Motion for Summary Judgment under the evidence before me and the law as it now stands and from concluding, as I do, that the Plaintiffs are not entitled to summary judgment.  Contrary to the Plaintiffs' assertions, the Eleventh Circuit did not hold that Inland's payments to Premiere violated RESPA.  That issue was never before the Eleventh Circuit.

The issue before me is whether the Plaintiffs have carried their burden of proving that the total compensation (not just the YSP) paid to Premiere and to Homebuyers was unreasonable in light of the circumstances of the Culpeppers' loan and of Ms. Hiers' loan.  That issue has never been addressed by any court, and therefore the law of the case doctrine does not apply to my decision.

## **CONCLUSION**

For the reasons set forth above, the Plaintiffs' Renewed Motion for Summary Judgment will be **DENIED** and Defendant's Motion for Summary Judgment will be **GRANTED**.  A separate order will be entered.

**DONE** this 7th  day of February, 2006.

**VIRGINIA EMERSON HOPKINS**

United States District Judge